280 F.2d 575
 PIASECKI AIRCRAFT CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, (UAW-AFL-CIO) and its Local 840, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 12912.
 No. 12995.
 United States Court of Appeals Third Circuit.
 Argued February 1, 1960.
 Decided June 20, 1960.
 As Amended on Denial of Rehearing in No. 12912, August 26, 1960.
 
 Francis E. Marshall, Philadelphia, Pa. (James J. Davis, Davis, Marshall & Crumlish, Philadelphia, Pa., on the brief), for petitioner Piasecki Aircraft Corp.
 Lowell Goerlich, Washington, D. C. (Ernest S. Wilson, Jr., Wilmington, Del., on the brief), for petitioners UAW-AFL-CIO and its Local 840.
 Allison W. Brown Jr., Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Atty., N.L.R.B., Washington, D. C., on the brief), for respondent N.L.R.B.
 Before GOODRICH, HASTIE and FORMAN, Circuit Judges.
 FORMAN, Circuit Judge.
 
 
 1
 In case No. 12,912, Piasecki Aircraft Corporation (Piasecki) has petitioned for review of, and to have set aside, an order of the National Labor Relations Board (Board) issued against it on March 25, 1959, following proceedings under Section 10 of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.[1]
 
 
 2
 In case No. 12,995, International Union, United Automobile Aircraft and Agricultural Implement Workers of America, UAW-AFL-CIO and its Local 840 (Union) seek review of the same order.
 
 
 3
 The Board requests enforcement. The cases have been consolidated.
 
 
 4
 This court has jurisdiction of the proceedings under Section 10(e) and (f).
 
 
 5
 The controversy arises out of the purchase by Piasecki of the plant and certain effects of the Bellanca Aircraft Corporation (Bellanca) located at New Castle, Delaware. The agreement between the parties was executed October 24, 1956, and provided for the sale by Bellanca to Piasecki of its tract of land at New Castle of about 300 acres and all the buildings situate thereon together with all of the machinery, equipment and other property located on said tract.
 
 
 6
 Following Board conducted elections in December of 1941 and May of 1942, the Union and Bellanca maintained collective bargaining relations. Two units had been established, one was comprised of production and maintenance employees, the other of office and clerical employees. The most recent contract was signed on June 1, 1955 and among others contained the following pertinent provisions:
 
 
 7
 "Paragraph (86): Effectivity: (a) This agreement shall become effective June 1, 1955, and shall remain in full force and effect for a period of two years from such date, and for additional periods of one year thereafter with the proviso that, should either party elect to terminate this agreement or to modify any portion of any of the terms thereof, it shall notify the other party in writing not less than sixty (60) days prior to the expiration date of the end of any subsequent yearly period, that the party giving such notice desires to terminate the agreement at the end of such period or to negotiate such amendments or changes of the terms or provisions thereof as are specified in such notice."
 
 
 8
 "Paragraph (89): Assignability: Notwithstanding anything contained in this Article XIV to the contrary, this agreement may be terminated prior to the expiration date stated in Paragraph (86) of this Article in the event that the plant or business of the Company, located at New Castle, Delaware, shall be sold, assigned or transferred to a person, firm, or corporation that is not affiliated with the Company. In such event the Company shall notify the Union in writing at least fifteen (15) days prior to the consummation of such sale, assignment, or transfer."
 
 
 9
 The transfer, pursuant to the agreement of sale, took place on November 23, 1956.
 
 
 10
 Bellanca had employed approximately 140 maintenance and production workers and seven clerical employees. The employment of all, except for four in the clerical unit and one in the maintenance unit, came to an end on November 23, 1956. These five were hired by Piasecki on November 25, 1956.
 
 
 11
 The Union took the position that it was the exclusive representative of the employees and filed charges against Piasecki alleging unfair labor practices under Section 8(a)(1), (3) and (5), in that as successor of Bellanca it had refused to bargain collectively with the Union. It further charged that although there was work available for all employees on the same jobs they had performed for Bellanca, Piasecki
 
 
 12
 "has refused to recall to employment or employ said employees in the aforesaid unit covered by said agreement because said employees are active in or members of said union or have engaged or are engaged in concerted activities for their mutual aid and protection and said Piasecki refuses to employ said employees unless they repudiate said union; that said Piasecki has locked out said employees."
 
 
 13
 On June 12, 1957, the General Counsel of the Board, on its behalf, issued a complaint against Piasecki in which it alleged inter alia, the following:
 
 
 14
 "9. Respondent did on or about November 21, 1956, cause the discharge of the following employees at said New Castle, Delaware, plant:" [135 employees are listed.]
 
 
 15
 "11. Respondent did discharge and did fail and refuse to reinstate the employees named in paragraph 9 above, because said employees were represented by and were members of the Union, because they refused to abandon their right to bargain collectively through the Union and because they engaged in other concerted activities for their mutual aid and protection."
 
 
 16
 "14. On or about November 5, 8, 13, 17, and 30, 1956 the Union requested Respondent to bargain collectively in respect to rates of pay, wages hours of employment, and/or other conditions of employment, with the Union as the exclusive bargaining representative of the employees of the Respondent. * *"
 
 
 17
 "15. On or about November 6, 1956, and at all times since, Respondent did fail and refuse and continues to fail and refuse to bargain collectively with the Union as the exclusive bargaining representative of the employees * * *"
 
 
 18
 "21. The acts of Respondent described above constitute unfair labor practices affecting commerce within the meaning of Section 8, subsection (a)(1), (a)(3), and (a)(5), and Section 2, subsections (6) and (7), of the Act."
 
 
 19
 Piasecki denied these charges. The trial examiner, however, found that Piasecki had violated Section 8(a)(3) by pursuing hiring practices which discriminated against union members, thereby discouraging membership in the union; that it had violated Section 8(a) (1) by interfering with, restraining and coercing applicants for employment in the exercise of rights granted in Section 7; and that such unfair labor practices affected commerce within the meaning of Section 2, subsections (6) and (7). He also found that Piasecki did not violate Section 8(a)(5) because it was not a successor to Bellanca in the sense that the Union represented a majority of the employees on Piasecki's payroll on and after November 26, 1956 and recommended that that charge be dismissed.
 
 
 20
 As a remedy he recommended that Piasecki, its officers, agents and assignees shall:
 
 
 21
 (1) Cease and desist from such unfair labor practices, and
 
 
 22
 (2) Take the following affirmative action to effectuate the policies of the Act: Offer the 135 individuals named in Appendix A attached to this report
 
 
 23
 "immediate employment at the same or substantially equivalent positions at which they would have been employed had they not been discriminated against without prejudice to their seniority or other rights and privileges and to make whole all these aforesaid for any loss of pay suffered * * *"
 
 
 24
 Implementing action also recommended to be taken was to preserve and, upon request, make available to the Board or its agents, all records necessary to analyze the amounts of back pay due, and to post at its plant in New Castle, Delaware, notice of the recommendations.
 
 
 25
 Thereafter, Piasecki, the General Counsel, and the Union filed exceptions to the Trial Examiner's Report.
 
 
 26
 On March 25, 1959, the Board filed its decision. It adopted the findings, conclusions and recommendations of the Trial Examiner with one modification which will be discussed later.
 
 
 27
 An order was entered by the Board on March 25, 1959 implementing its decision and remedy.
 
 
 28
 Piasecki's Petition for Review of and to Have the Board's Order Set Aside.
 
 
 29
 Piasecki argues that the findings and conclusions of the Trial Examiner, adopted by the Board, are not supported by substantial evidence on the record as a whole.
 
 
 30
 On October 30, 1956, Piasecki wrote to all Bellanca employees inviting them to apply for work, enclosing job application forms.
 
 
 31
 Among the questions posed in the application blank were:
 
 
 32
 "Have you been a member of a union? __________"
 
 
 33
 "Which ones? _____________"
 
 
 34
 "Are you now? _______"
 
 
 35
 "Which? _______________"
 
 
 36
 Between November 2 and November 16, 1956, Piasecki received 75 responses to its communications, or from about 50% of the Bellanca employees.
 
 
 37
 Meanwhile on November 1, 1956, Harry E. Blythe, Executive Vice President of Bellanca, wrote a letter to each of its employees advising them of the sale of the plant.
 
 
 38
 On the same date he also wrote to B. W. Bothe,[2] Assistant Regional Director of the Union, as follows:
 
 
 39
 "Dear Mr. Bothe:
 
 
 40
 "Please be advised that the Bellanca Aircraft Corporation is now engaged in negotiating the sale of its real estate and certain other assets at New Castle, Delaware. This sale will be consummated and become effective on or about 11/23/56.
 
 
 41
 "Pursuant, therefore, to paragraph 89 of the present labor agreement between the said Company and the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America and its Local No. 840, affiliated with the AFL-CIO you are hereby advised of such sale and transfer at least fifteen (15) days prior thereto.
 
 
 42
 "Please be advised further that pursuant to the said paragraph the said Company now notifies said labor organization and both of them that it hereby terminates said labor agreement effective midnight 11/23/56.
 
 
 43
 "Very truly yours,
 "Bellanca Corporation
 "Harry E. Blythe
 "Executive Vice
 President"
 
 
 44
 On November 5, Bothe and Laurence Loroni, as President of Local No. 840, signed a letter addressed to Bellanca and Piasecki, as follows:
 
 
 45
 "Gentlemen:
 
 
 46
 "We are in receipt of a letter dated November 1, 1956, signed by Harry E. Blythe, Executive Vice President, Bellanca Corporation, which attempts to involve Paragraph 89 of the Agreement between the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, Local 840 and the Bellanca Corporation, dated June 1, 1955. While this letter is not explicit, we are assuming that the sale referred to is to the Piasecki Aircraft Corporation.
 
 
 47
 "In view of the fact that the notice referred to in Paragraph 89 was not given to the above unions in conformity with the agreement on behalf of the above unions, we shall insist that the provisions of the contract be fulfilled in every detail.
 
 
 48
 "We also call your attention to the fact that the contract is open for negotiations in respect to wages as of November 1, 1956, and request that the Bellanca Corporation if it is still the operator of the company, meet with us for such purpose. However, if a bonafide sale has been made, we request that the successor meet us for such purpose.
 
 
 49
 "In any event, we request that the successor meet with us for the purpose of collective bargaining as representatives of the employees of the Bellanca Corporation, its successors or assigns in conformity with the requirements of the Labor Management Relations Act of 1947.
 
 
 50
 "The employees now employed by Bellanca Corporation, or on the seniority list, and requested by the above unions are available for employment with its successors or assigns, in accordance with the terms of the above agreement and/or of the Labor Management Relations Act.
 
 
 51
 "We request that you meet with us on Monday, November 12, 1956, at a place of your selection.
 
 
 52
 "Very truly yours,
 "International Union United
 Automobile, Aircraft and
 Agricultural Implement
 Workers of America
 "By: B. W. Bothe
 "Assistant Director,
 Region 8
 "Local Union No. 840, UAW
 "By: Laurence Loroni,
 President"
 
 
 53
 On November 13, Bothe and Loroni wrote to Piasecki welcoming the change in management at Bellanca, promising full cooperation and inviting Piasecki to send representatives to a conference at 12 noon on November 16, at the New Castle plant.
 
 
 54
 The meeting mentioned above was held as scheduled, but Piasecki was not represented. It did not respond to any of the Union's communications.
 
 
 55
 On November 16, 1956, Piasecki addressed the following letter to all of the Bellanca employees who had returned completed application forms prior to November 15, 1956:
 
 
 56
 "November 16, 1956
 
 
 57
 "This is to acknowledge receipt of your application for employment by Piasecki Aircraft Corporation.
 
 
 58
 "Our representatives would like to review your application and talk to you in the lobby of the New Castle Plant, Delaware, any time between noon and 4:30 p. m., Sunday, November 25, 1956.
 
 
 59
 "A photographer will be present to take a picture of you that is required for security clearance. Please bring your birth certificate and/or other proof of citizenship.
 
 
 60
 "Please present this letter to our representative when you come for the interview.
 
 
 61
 "If the above scheduled interviewing period is inconvenient to you, please call Philadelphia, Saratoga 7-9750, Ext. 12, and ask for Mr. Franklin Moser, Director of Industrial Relations.
 
 
 62
 "Sincerely yours,
 "Piasecki Aircraft Corporation
 "F. N. Piasecki
 President."
 
 
 63
 Up to November 14, 1956, the Union had taken no position as to whether employees should file applications with Piasecki, but on that date Bothe met with officers of Local No. 840 and it was decided that the Union should assist its members in completing and submitting their applications. It arranged for necessary photographs and each of 135 of 138 members of the Union signed a letter in the following form:
 
 
 64
 "Piasecki Aircraft Corporation
 International Airport
 Philadelphia, Pennsylvania.
 
 
 65
 "Dear Sirs:
 
 
 66
 "This is to advise you that I am applying for employment with your Corporation at your New Castle plant.
 
 
 67
 "I shall be available for such employment with you on and after November 24, 1956.
 
 
 68
 "I am submitting under separate cover (or have previously submitted) your standard employment application form, which was mailed to me by your Corporation.
 
 
 69
 "My submission to you of such application form for employment by your Company is not to be construed as any waiver by me of any rights which have accrued to me or will accrue to me under the June 1, 1955 contract by and between the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America and its Local No. 840 and the Bellanca Corporation and/or the Labor Management Relations Act of 1947.
 
 
 70
 "Signature ..........
 "Home Address .......
 "City and State .....
 "Bellanca Corp.
 "Badge No. .........."
 
 
 71
 On November 17, the Union forwarded to Piasecki the applications and letters accompanied by its own letter signed by Bothe, as follows:
 
 
 72
 "November 17, 1956

 "Piasecki Aircraft Corporation
 International Airport
 Philadelphia, Pennsylvania.
 
 
 73
 "Dear Sirs:
 
 
 74
 "In a meeting between representatives of our Union and the Bellanca Corporation held Friday, November 16, we were officially advised for the first time that commitments and arrangements for your corporation to take over the physical assets of Bellanca's New Castle facility, including real estate, machinery, equipment, supplies and certain work in progress, have been in existence since approximately November 1. We were further informed that you will take physical possession on November 23, 1956.
 
 
 75
 "Therefore, we are transmitting to you herewith, 135 letters applying for employment at your New Castle, Delaware plant which have been individually executed by the members of Local 840 currently employed by the Bellanca Corporation at the New Castle facility. An alphabetical list of the senders of such letters is also attached for your convenience of reference. All of these employees will be available for such employment with you on and after November 24, 1956.
 
 
 76
 "In line with our letter to you of November 13, 1956, wherein we stated our intention to cooperate with you as the successor management of the New Castle plant, we have also urged our membership to complete and return to you your standard "application for employment form". Your Corporation had mailed such forms to our members at Bellanca on or about October 30, 1956. We trust you have received same.
 
 
 77
 "Further, in view of the information given to us by Bellanca, we desire to meet with your representatives on either Tuesday, November 20 or Wednesday, November 21. In such meeting we desire to discuss your immediate and future manpower requirements at the New Castle plant and make appropriate arrangements for the recall of Bellanca employees to such jobs in accordance with their seniority as established in the Agreement between Bellanca Corporation and the International Union, UAW and its Local 840, dated June 1, 1955, and also to establish a basis for further collective bargaining between the parties.
 
 
 78
 "Will you kindly advise us promptly as to the date, place and time you will find most convenient for such meeting?
 
 
 79
 "Yours very truly,
 "International Union UAW
 AFL-CIO
 "By: B. W. Bothe, Assistant
 Director Region 8
 "Local Union No. 840 UAW
 AFL-CIO
 "By: Laurence Loroni,
 President
 "BWB/LL/ms
 "Enclosures — 135 Letters
 2-Page Alphabetical
 Listing
 "Certified Mail Return Receipt —
 Special Delivery"
 
 
 80
 Piasecki did not acknowledge the receipt of the above communication or its enclosures. None of the applicants who submitted applications after November 15 were sent individual letters notifying them of the proposed date for interviews, Sunday, November 25, as noticed in its letter of November 16.
 
 
 81
 Piasecki claimed that the processing of such applications left no time in which to give notice. But advertisements were inserted in two Wilmington, Delaware newspapers, on November 24, 1956, and in the Philadelphia Sunday Bulletin and in the Philadelphia Sunday Inquirer on November 25, the day set for interviews. These stated, as did Piasecki's letter of November 16, that applicants would be interviewed on that day between noon and 4:30 p.m. in the lobby of the New Castle plant and on weekdays from 10 a.m. to 5 p.m.
 
 
 82
 During the week of November 19 Bellanca gave notice to all its employees that it was terminating their services effective November 23, 1956.
 
 
 83
 Bellanca and Piasecki closed their agreement of October 24, 1956 on November 23. On Sunday, November 25, Piasecki's representatives came to the plant to conduct interviews. The front door, which opened into a lobby, had a large glass panel. Some 60 of Bellanca's former employees congregated outside, their union officers among them.
 
 
 84
 On November 25, at 12:30 p. m., James Henry Manning, Piasecki's Contract Administrator and Quality Control Manager, stepped outside the plant door and announced that the company was ready to interview applicants. Thereupon a number of former Bellanca employees attempted to enter the lobby but found the door locked according to their testimony. Piasecki's representatives testified that the door was not locked.
 
 
 85
 Actually the Bellanca supervisors, four of the Bellanca clerical force and one Bellanca maintenance employee — a janitress were interviewed and hired that afternoon. Seventeen non-Bellanca applicants were interviewed, but none were hired and none of the production workers of Bellanca were either interviewed or hired.
 
 
 86
 On Monday morning, November 26, pursuant to a determination previously made all of the Bellanca employees appeared at the plant in their work clothes at seven o'clock. At that time Piasecki's supervisory and staff personnel entered the plant. Shortly thereafter former Bellanca employees attempted to enter the door but found it locked. Later in the morning an officer of the Delaware State Police arrived at the plant entrance and requested a meeting of representatives of both Piasecki and the Union. At his request Bothe and a Bellanca employee accompanied him and all three were admitted to the lobby. Piasecki's Director of Industrial Relations Franklin Moser informed the officer that Frank Piasecki, the corporation's president, would meet with him but not with any Union representatives. No meeting was held. Before leaving with the officer Bothe informed Moser that the Union desired to meet with Piasecki's representatives to
 
 
 87
 "go over your wishes and desires and intentions about the former Bellanca employees. They are all outside the plant. They are offering themselves for employment. They want their jobs and we would like to get this situation clarified."
 
 
 88
 Moser stated that he would take the matter up with Frank Piasecki and let Bothe know but there was no further communication between Moser and Bothe. When the latter telephoned Moser the operator advised him that Moser would not accept the call. The employees remained outside the plant all day. From time to time the door was tried but found to be locked.
 
 
 89
 That night at a Union meeting the Bellanca employees voted to establish a picket line at the plant on the following morning, November 27, which they did. On the same day the Union addressed another letter to Piasecki renewing its request for a meeting and recognition as exclusive bargaining agent at the New Castle, Delaware plant.
 
 
 90
 On November 30 Piasecki addressed a letter to each Bellanca employee inviting him to appear for an interview in Philadelphia.
 
 
 91
 The General Counsel and the Union alleged that on November 25 Piasecki's representatives contrived to keep the door locked to Bellanca union production workers while admitting others. As stated above, Piasecki's representatives denied this and testified that they waited the entire afternoon but that no production workers entered the lobby for an interview.
 
 
 92
 The Board adopted the view of the trial examiner that the door was locked to the Bellanca production workers because of their affiliation with the Union.
 
 
 93
 Piasecki asserts that this finding is erroneous. It argues that in addition to the conflict in testimony as to whether the door was locked there was absence of proof of any method whereby Piasecki could have effectuated a policy of selective admission to the lobby. It submitted that the economic realities of the situation did not lend themselves to such action, for Piasecki had purchased the plant with its enormous capacity for the purpose of attracting contracts which would lead to volume production; and that it had promptly written to all Bellanca employees in an attempt to obtain from them applications for employment.
 
 
 94
 It further submitted that while applications were received from only 50 percent of the Bellanca employees this was more than enough to indicate to the production manager that the immediate needs which were estimated to be between 37 and 50 could be filled; that in making arrangements for interviews it followed its established policy to which all of its employees had been subjected. It argued that it was not merely a question of credibility of witnesses, but that an "intrinsically incredible situation" resulted from the circumstances that manifested themselves when the interviews were announced. These, it asserts, evidenced themselves in the fact that at no time did a line form, nor was there any "banging" at the door which allegedly was locked; that people never went to the lobby door but sat in their cars for several hours; that nearly every one who did go to the door was an officer of the Union, or a member of its committees, e. g. two were regional representatives of the International and were not actually applicants for employment; and that only three or four, if any, of the rank and file attempted to enter.
 
 
 95
 Piasecki further contended that the questions concerning applicant's union affiliations contained in its application blanks could not form the foundation that they were designed to exercise unlawful coercion and argues that the inquiry was merely routine and not shown to have been pursued by Piasecki for the purpose of affecting a policy of hiring only those whose answers to the inquiry showed no union affiliation.
 
 
 96
 Piasecki points out that findings and conclusions were adopted which were patently not supported by the record as a whole because no weight was given to the purpose which was being pursued by the Union, i. e. that there was no rehiring to be done, but that Piasecki was merely to continue as successor to Bellanca subject to the same bargaining and labor contract obligations. Piasecki contends that because it was not a successor to Bellanca it would have been guilty of an unfair labor practice had it hired Bellanca's former employees through the Union. It submits that it was not only free to hire independently but was required by the law to do so on the ground that all other persons who might seek employment with it were "employees" within the meaning of the Act and equally as entitled to non-discriminatory hiring procedures as the former Bellanca employees.
 
 
 97
 Piasecki further contends that even if it is found to have violated Section 8(a) (1) and (3) the violations were cured by its subsequent conduct. It alleges that the finding that it locked out the applicants on November 25 and thereafter was made without any consideration of the events that occurred after that date. These, it urges, showed its continued efforts to obtain employees while resisting the efforts of the Union to "serve as a hiring hall". It pointed to the invitation sent to all employees on November 30 to appear for interview in Philadelphia which, it suggested, was completely justified since the New Castle plant was being picketed. It claimed that the silence of the employees in the face of this invitation was fatal to any claim that they might have for employment. Moreover, it contended, it was not required to continue to make the offer when it appeared futile to do so.
 
 
 98
 In his report, adopted by the Board, the Trial Examiner made a careful and detailed analysis of the evidence surrounding the alleged lockout.
 
 
 99
 It seems apparent from Paragraph 13[3] of the contract for sale between Piasecki and Bellanca that Piasecki was fully aware of the contract between Bellanca and the Union and that it did not intend to expose itself to any obligation which bound Bellanca, and, therefore, required Bellanca as a condition of sale to discharge all of its employees prior to settlement, as provided for in Paragraph 89 of the Bellanca-Union contract.
 
 The Trial Examiner concluded that:
 
 100
 "From the foregoing evidence it is manifest to the Examiner that the Respondent was determined at all costs to avoid hiring the Bellanca employees who were associated with the Union and the employment of whom in large numbers would result in the Respondent's being saddled with a union majority and the obligation to bargain with the UAW. In view of this background, and from my observation of the witnesses, it is my conclusion that the testimony of the General Counsel's witnesses to the effect that the plant door was locked on November 25 when they endeavored to enter, must be accepted as the more credible. I so find. I further find, on this record, that the Respondent locked out these applicants for employment on November 25 and thereafter because of their affiliation with the Union. It is likewise my conclusion that had it not been for the Respondent's unlawful determination to prevent the Union from having any adherents in the plant it would have hired many more of the former Bellanca employees as production increased, and that it did not do so because of its continuing discrimination against all job applicants who were affiliated with the UAW."
 
 
 101
 The argument made by Piasecki that the finding that the door was locked against the Union employees on November 25 is incorrect, because no line of applicants formed at the door and only a relatively few actually tested it while others waited around or sat in their cars, and that no one was shown to have "banged" on the door when denied admission, is not sufficient to shake that finding. There is no question that virtually the entire supervisory staff of Bellanca was hired early on November 25, among them, Gustave Pasquarella, for 17 years an employee and then plant supervisor of Bellanca who was to provide identical services for Piasecki. Indeed he and others had been practically bespoken for during the interim period between the signing of the contract and the settlement. It is significant that his application was dated November 10. He knew every employee in the Bellanca outfit by face and name. He was in and about the lobby of the plant during the entire afternoon. He received a telephone call from Anne Chirco, a clerical employee, that she and four other office workers and the janitress were on their way to the plant. Pasquarella met them on the street, and conducted them through the door into the lobby where they were interviewed and hired. In contrast to the locked door said to have been encountered by union applicants who tried it, the throng of Bellanca employees saw 17 non-Bellanca people enter without difficulty.
 
 
 102
 It was within the province of the fact finder, notwithstanding the denials of Piasecki's representatives, to draw an inference under all of the circumstances that an arrangement existed whereby union employees did not get into the lobby. It must have been known that they were not getting through the door. Strange it is that none of the Piasecki staff made a single gesture to any one of them to come into the lobby after Manning's first announcement of readiness at 12:30 o'clock. It is much more understandable that in these circumstances the bulk of the union people should conclude that no effort to open the door much less "banging" on it would gain them access.
 
 
 103
 Whether the questions in the application blanks concerning former union affiliation would in themselves furnish the basis for a charge of discrimination need not be decided. But the fact that they were contained in the applications permitted them to be looked upon together with all the other evidence for the purpose of determining whether there was discrimination in the case.
 
 
 104
 Piasecki's contention that the Board did not make its findings and conclusions on the record as a whole because it failed to give weight to the Union's position that no rehiring was to be done but that Piasecki was a successor to Bellanca and therefore subject to its contractual obligations with the Union, cannot stand. Granted that the Union did assume such a position and granted, moreover, that the applicants maintained their allegiance to the Union, Piasecki could not therefore disqualify them from employment for to do so would be to discourage their membership in the Union in violation of Section 8(a) (3).
 
 
 105
 Piasecki's further contention that it cured its violations of Section 8 (a) (1) and (3), if any, by its subsequent invitations to the Bellanca employees to be interviewed for jobs with it, to which the Board, it submits, gave no consideration must also fall. Piasecki bottomed its contention on the fact that despite its specific letter of November 30 to the Bellanca employees and its advertisements inviting applicants to apply at Philadelphia for interviews, no Bellanca applicants appeared. The Bellanca employees, however, were justified by Piasecki's actions of November 25 and 26 in concluding that their union affiliation would be a bar to employment, and that the journey to Philadelphia would be a futility.
 
 
 106
 The Trial Examiner accepted the testimony of Bothe that he had a conversation with Pasquarella during the afternoon of November 25 in which the Trial Examiner found that he [Bothe]:
 
 
 107
 "protested to Pasquarella that many of the union members had come to the plant that afternoon in response to letters from Piasecki which invited them for an interview and that having done so `they were faced with a locked door'. Bothe testified that he then asked Pasquarella `What's going on here that nobody can get in the plant to see about getting their jobs?' and that, in reply the latter schrugged his shoulders and stated, `Well, this is a mixed up affair. It's a very mixed up affair. You know how Frank [Piasecki] feels * * * If you and the other union guys are really interested in your people and you want them to get in this plant you will get away from here today.'"
 
 
 108
 A conversation of similar vein was accepted by the Trial Examiner as having occurred on November 28 between Loroni and Robert Willey who held an executive position with Piasecki.
 
 
 109
 The Trial Examiner was justified in holding that these conversations and the attitude of Piasecki generally with regard to the Union evidenced a determination not to be cast into a relationship with it, and gave rise to a hostility toward the individual employees of Bellanca because of their obvious loyalty to the Union.
 
 
 110
 A further discussion of the evidence before the Trial Examiner which was exceedingly voluminous is unnecessary because substantial evidence considering the record as a whole which we have reviewed as required by Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, exists to support the Board's finding that Piasecki discriminated against those named in the order in violation of Section 8(a) (1) and (3).
 
 
 111
 The Union's Petition For Review of the Order of the Board.
 
 
 112
 As was indicated at the head of this opinion, the International Union, United Automobile, Aircraft, and Agricultural Implement Workers of America (UAW-AFL-CIO), and its Local 840 (which will continue to be called the Union herein) expressed dissatisfaction with the order of the Board by filing their petition for review.
 
 
 113
 The Union's differences with the Board consist mainly of the Board's failure to find that Piasecki violated Section 8(a) (5) on the ground that Piasecki was a successor to Bellanca and therefore was bound by the terms of the Bellanca-Union contract; and that the Trial Examiner and the Board erred in confining the issues to the legal position taken by the General Counsel who declined to adopt the contention of the Union that the said contract bound Piasecki.
 
 
 114
 The position of the Union as taken here was fully aired before the Trial Examiner who considered it exhaustively. The factual circumstances with respect to the similarity of function of Piasecki and Bellanca were considered as well as cases cited.[4] The Trial Examiner held, however:
 
 
 115
 "* * * in the cases relied on by the General Counsel and the Union there was present an identity of parties in both the predecessor and the successor, the labor organization at the predecessor was certified by the Board less than a year before the sale or transfer of the plant to a successor or the successor continued in the same business at the same location with an assumption of liabilities and a transfer of intangibles such as good will or a trade name. Here there was no identity of the parties as between Bellanca and Piasecki nor was there a recent certification of the Union. Moreover, although there was a transfer of the supervisory personnel and much of the work-in-process, there was no assumption of liabilities nor was there a transfer of a trade name or good will. For these reasons I conclude and find that Piasecki was not a successor to Bellanca within the meaning of the Act. Cf. Herman Lowenstein, Inc., 75 NLRB 377, 379-80; Juneau Spruce Corp., 82 NLRB 650, 658-659."
 
 
 116
 The Trial Examiner held, therefore, as noted earlier, that Piasecki had not violated Section 8(a) (5) and accordingly, recommended that that part of the complaint be dismissed.
 
 
 117
 It was in this connection that the Board modified the Trial Examiner's report. Thus, while agreeing that no violation of Section 8(a) (5) had occurred, it prescribed the following remedy:
 
 
 118
 "Although we have found that the Respondent did not violate Section 8(a) (5) of the Act, we shall issue a remedial order requiring the Respondent, upon request, to bargain with the Union as the representative of its production and maintenance employees, after offering reinstatement to the discriminatees pursuant to the Board's 8(a) (3) remedial order. It is clear, and we find that the unit described in the complaint, for which the Union was certified approximately 17 years earlier, is an appropriate production and maintenance unit. The Union established that it represented a current majority of the persons in this unit in November 1956. It secured newly signed authorization cards from 138 of the 139 persons who were employed in the unit on November 23, the last day of operation of the plant by Bellanca. It is undisputed that the Union on several occasions between November 6 and November 30 requested the Respondent to bargain. As found by the Examiner, the record indicates that the Respondent originally planned to hire all of the persons in the production and maintenance unit. Had not the Respondent later engaged in illegal discrimination because the persons in the unit had demonstrated their continued adherence to the Union, the Respondent would have become the employer of employees in an appropriate production and maintenance unit represented by the Union; and, as such, the Respondent would have been obligated to bargain with the Union upon request. The Respondent has thus sought to avoid its bargaining obligation by engaging in unlawful discrimination. We therefore find that to remedy the Respondent's 8(a) (3) violations effectively, and also to effectuate the policies of the Act, it is necessary that Respondent be ordered not only to employ the discriminatees and make them whole, but that Respondent also be ordered to bargain with the Union upon request as soon as the Respondent employs the discriminatees in the manner described in the section of the Intermediate Report entitled "The Remedy'."
 
 
 119
 As to the binding effect of the Bellanca-Union contract and the jurisdiction of the General Counsel over the scope of the complaint, the Trial Examiner held:
 
 
 120
 "One other matter in this connection was raised by the Charging Party. At the hearing and in its brief the Union has contended that its contract with Bellanca was never validly terminated, that this agreement was a binding obligation on Piasecki as a successor or assignee of Bellanca, and that, as a result, on this basis alone, Piasecki was obligated to recognize and bargain with the Union throughout the effective period of the contract. This argument, however, was not grounded on any theory of the complaint, for the latter alleged only that the Respondent was under a statutory obligation to bargain with the Union. At the hearing, the General Counsel did not allege that the Respondent was under a duty to bargain as the result of a contractual obligation and he at no time took the position that the aforesaid agreement was binding upon the Respondent. It is the General Counsel who determines the scope of the complaint and none of the other parties may amend, enlarge or modify its allegations. Dallas Concrete Co., 102 NLRB 1292, 1293, 1296-1297, enfd., 212 F.2d 98 (C.A. 5); Sailors Union of the Pacific, AFL, 92 NLRB 547, fn. 1. Consequently, in this case, since the Union's contention that the Respondent has breached a contractual obligation to bargain is not encompassed by, nor relevant to, any allegation in the complaint, it need not, and will not, be considered in this Report."
 
 
 121
 In effect the Union charged that the complaint filed by the General Counsel was broad enough to support proofs that Piasecki was bound by the contract; that those proofs, including the contract, were in evidence without objection; and that a finding of the binding effect of the contract should have been made. The Union urges that the case be remanded to the Board for that purpose.
 
 
 122
 But the fact is that the Union's contract with Bellanca specifically provided in Paragraph 89 thereof for termination prior to its expiration date in the event that the plant or business was sold to a vendee not affiliated with Bellanca upon the giving of 15 days notice prior to the consummation of the sale.
 
 
 123
 The Union alleges a conflict between this provision of the contract and Section 8(d) (1)[5] which provides for a sixty day notice of termination. Perhaps this section could create liability between Bellanca and the Union but it does not embrace Piasecki — not a party to the contract.
 
 
 124
 The Union also sought to show that Piasecki became the employer of the Bellanca workers because it allegedly controlled the operations at the Bellanca plant between October 24, 1956, the date of the agreement for sale and November 23, 1956, the date of settlement, because
 
 
 125
 "1. Piasecki integrated its operations with those of Bellanca and utilized Bellanca facilities and personnel by working with Superintendent Pasquarella in estimating future personnel needs and planning assumptions (* * *); by conferring with and offering jobs to supervisory personnel (* * *); by making all purchases for work in process for the Bellanca operations utilizing Bellanca personnel as well as its own (* * *); by performing its own work in the plant (* * *); by utilizing Bellanca employees for taking inventory (* * *); by obligating Piasecki for Bellanca's employee's phone calls (* * *); and by employing Bellanca employees for the purchase of materials for work to be completed after November 21 (* * *).
 
 
 126
 "2. By causing the discharge of all employees covered by the agreement between Bellanca and the Unions.
 
 
 127
 "3. By the coincidence of the interests of Piasecki and Bellanca under the agreement of October 24."
 
 
 128
 [Omissions are to record references.]
 
 
 129
 While Piasecki did control the purchases at the Bellanca plant for about three weeks prior to November 23, and the incidents listed above occurred, a relationship of employer and employee was by no means created thereby. For the most part these activities were in preparation for the transfer on November 23. The employees remained on the payroll of Bellanca subject to the terms of the contract between it and the Union and Bellanca actually sent termination notices to them.
 
 
 130
 The Board was within its province in according determination of the scope of the complaint to the General Counsel, Section 3(d),[6] who did not contend that Piasecki was contractually obligated to bargain with the Union. Rather the General Counsel sought to ground Piasecki's obligation to bargain on Section 8(a) (5) and it was within his domain to so formulate the complaint and its prosecution. Amalgamated Utility Workers v. Consolidated Edison Co., 1940, 309 U.S. 261, 264-265, 60 S.Ct. 561, 84 L.Ed. 738.
 
 
 131
 It is true as was said by this court in Marine Engineers' Ben. Ass'n v. N. L. R. B., 3 Cir., 1953, 202 F.2d 546, 549:
 
 
 132
 "Our best judgment is that the charging party after complaint is issued, does have some standing. The Board may refuse to do anything about his complaint, as already indicated. But once it does, and once it goes to the extent of filing a complaint, then we think that he is entitled to have a chance to be heard as the Administrative Procedure Act requires. He has a right to object if after hearing he does not like the result. But he certainly has nothing on which to base his objections unless there is a hearing and a record is made so that the court has something to go on."
 
 
 133
 In this case all of these rights were vouchsafed to the Union. It examined and cross examined, argued and was granted full expression before the Board and has been heard on this appeal. That its arguments are not always successful does not connote a deprivation of its opportunity to make them.
 
 
 134
 The Union urged that aside from the asserted contractual obligation Piasecki has violated Section 8(a) (5) because as successor to Bellanca it was required to bargain with it as the representative of the majority of the workers regardless of whether any of them had been hired by Piasecki. However, the Board concluded that Piasecki was not a successor to Bellanca and that its employees never became the employees of Piasecki. It recognized the distinction in Section 8(a) (5) wherein an employer is required to bargain in good faith with the representatives of "his employees" and held that the Bellanca workers were not "his [Piasecki's] employees" within the meaning of that section.
 
 
 135
 The Union contends that Section 8(d) requires the employer to bargain with the "representative of the employees", not "his employees" as in Section 8(a) (5); and that these sections must be read together with the result that Section 8(d) "must modify or supercede [sic] 8(a) (5)." This and other similar arguments are inapplicable in the face of the Board's determination that Piasecki was not Bellanca's successor.
 
 
 136
 As we have seen the Board was not deterred from regarding the same workers as employees in the generic sense within the meaning of Section 8(a) (1) and (3).
 
 
 137
 The vigorous arguments made by the Union that the Board's refusal to find Piasecki guilty of a violation of Section 8(a) (5) strike at the "basic fundamental policies" of the Act are not convincing. On the contrary the Board has acted well within its exercise of informed discretion which this court should not overrule.
 
 
 138
 The Union insisted that Piasecki "was required to bargain in any event with [it] for the appropriate office clerical unit and [that] its refusal to bargain in this respect constituted a violation of Section 8(a) (5)."
 
 
 139
 It submits that the Board's holding that the Union did not represent a majority of the clerical unit at the time it requested recognition is erroneous. The Union attributes the refusals to sign authorization cards by two of the four clerical workers hired by Piasecki to the discrimination practiced by it and contends that if the Board had considered this in the light of Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007, and other cases cited by it, it would not have found that the Union lacked a majority to represent the clerical workers unit.
 
 
 140
 From the evidence the Board was justified in holding that the Union failed to establish that its inability to produce authorization cards signed by a majority of the four clerical workers was the result of an unfair labor practice by Piasecki, and its ruling that the Union did not represent a majority of the clerical unit at the time it requested recognition must be sustained.
 
 
 141
 Another issue raised by the Union involved its allegation that it was an unfair labor practice for Piasecki to furnish buses to picket line breakers and deposit them behind the line where they would be inaccessible to union communication. No ruling was made by the Trial Examiner or the Board thereon.
 
 
 142
 In any event it was not alleged by the General Counsel as an unfair labor practice and he offered no evidence upon it.
 
 
 143
 Finally the Union contended that the termination of employment of the Bellanca workers was by reason of Piasecki's insistence and was an unfair labor practice in violation of Section 8(a) (1) and (3).
 
 
 144
 No reason appears to require rulings by this court on these matters in view of the over-all decision in this case.
 
 
 145
 Accordingly, the Union's arguments that the Board should have found that Piasecki violated Section 8(a) (5) cannot be sustained.
 
 
 146
 The Remedy.
 
 
 147
 As we have seen the Board not only ordered Piasecki to employ the workers against whom it had discriminated and to reimburse them for losses sustained but to bargain with the Union upon request as soon as the discriminatees have been offered reemployment.
 
 
 148
 Piasecki argues that its actions were at all times valid leaving no room for the application of any remedial order, but that in any event the Board's order should be limited to
 
 
 149
 "reinstatement and back pay to those workers who reported to the New Castle plant on November 25th and actually attempted to be interviewed and those (if any who thereafter reported to the Philadelphia plant and sought an interview * * *"
 
 
 150
 Further, it is said, the order should be limited to those who applied for "a job" for which they were qualified and which were later filled by others, and should not extend to those who applied for "their old jobs".
 
 
 151
 As far as the order to bargain with the Union is concerned Piasecki submits that the Board exceeded its power, which is limited to remedial measures, and in this case imposed a penalty. Piasecki characterized the action of the Board as
 
 
 152
 "a unique attempt to impose a duty to bargain as an alleged remedy for a different unfair labor practice and in the face of a finding (after a vigorous contest) that there was no duty to bargain."
 
 
 153
 The former Bellanca workers, long represented by the Union, undoubtedly felt ties to it and it is not strange that they should have associated themselves with it in their endeavor to achieve continuity of employment with Piasecki. On both November 25 and November 26 it was made known to them that such association made them ineligible for work in the eyes of Piasecki. The incidents on these days preclude the idea that upon presenting themselves for interview they would achieve employment notwithstanding their union memberships. Enough had occurred to convince each worker of the futility of making any such attempt. The advertisements requiring the workers to report to the Philadelphia plant for interviews and the invitations addressed to them on November 30 did not serve to dispel the definite conviction firmly fixed that former Union members would not be granted employment. Nor does the record support the assertion that the workers were demanding their "old jobs". All applications were on Piasecki's forms. At most the letter of transmittal, prepared by the Union, contained notification that the applications were not to be construed as a waiver of any rights under the Union's contract with Bellanca, and were not conditioned upon a recognition of the Union or demands for restoration of jobs with appurtenant rights established under the Union contract. The workers were applying for jobs with a new employer. The confusion which existed in their minds as to their status was justified by the turn of events and the realization that the Union benefits, which had been theirs for so long a period, had been brought to an end was difficult for them to conceive. It was natural for them to attempt to preserve the hope that somehow their union benefits would survive Piasecki's purchase of Bellanca. Therefore, they made it clear that their applications should not mean that they waived anything that might inure to them thereunder. This certainly did not detract from their unconditional applications for jobs.
 
 
 154
 In N.L.R.B. v. Textile Machine Works, Inc., 1954, 214 F.2d 929 this court held that a complaint against Textile, alleging violations by it of Section 8(a) (1), (3), 29 U.S.C.A. § 158(a) (1), (3) of the National Labor Relations Act, was barred by the time limitation imposed by Section 10(b), 29 U.S.C.A. § 160(b), where workers had requested reinstatement rather than employment as new employees. As shown above the facts in this case are distinguishable from those in Textile as they relate to the employees held there to have applied for reinstatement. The nature of the applications for employment was a fact question to be determined by the Board. There is ample evidence in the record to support the conclusion that Bellanca's former employees applied for new employment with Piasecki. Thus, this decision does not overrule or modify the prior decision in Textile Machine Works, Inc.
 
 
 155
 Piasecki charges that the record fails to show that as a result of the discrimination it hired others to fill the jobs for which the discriminatees had applied and were qualified. It was disclosed, however, that Piasecki actually hoped to take on anywhere from 37 to 50 employees on November 26; that it anticipated having 100 employees at work by the end of the year; and that thereafter the roll of workers would expand rapidly. The anticipation in this regard was not without foundation for by March 1957 Piasecki had a roster of 155 to 175 production workers, performing in jobs quite similar to those in which the Bellanca workers had served. Only one category was new and this consisted of nine so-called loft men, a classification that had not obtained in the Bellanca regime. The Board was justified in its conclusion that but for the discriminatory policy pursued by Piasecki the former Bellanca workers would have been hired to fill vacancies for which they were qualified. Its affirmative order that they should be hired and reimbursed for losses as a remedy is reasonable and well within the power conferred upon the Board. Section 10(c).[7] As noted by the Trial Examiner the record does not disclose with precision which employees would have been hired, and when, in the absence of the discriminatory practices, but those issues may be determined at compliance proceedings.
 
 
 156
 On first view it may appear that the Board created an anomalous situation in finding that Piasecki was not bound by the terms of Bellanca's contract with the Union and at the same time, requiring that after it offers employment to the discriminatees it should bargain collectively upon request. But a longer look makes manifest that the Board was justified in its determination that those workers who qualified would have received employment, and in the light of the newly signed authorization cards by 138 of the 139 employees in the production and maintenance unit which were signed on November 23, Piasecki would have been required to bargain with the Union. Therefore, while relieving Piasecki of the obligations of the Bellanca contract with the Union it nevertheless directed it to bargain collectively under the circumstances of its order, as an effective remedy for the Section 8(a) (3) violation and "to effectuate the policies of the Act." The design of the Board's order in directing Piasecki to bargain is to deprive it of the advantage gained in violating the Act.
 
 
 157
 We cannot agree with Piasecki that because the Board found no violation of Section 8(a) (5) it could not resort to this order as a remedy for the violation of Section 8(a) (3). And, contrary to its argument, we are bound to respect the expert judgment the Board has developed through its extensive experience in labor disputes which has prompted it to conclude that its order in this case will best effectuate the policies of the Act. See a case recently brought to our attention by the General Counsel, Editorial "El Imparcial", Inc., et al. v. N. L. R. B., 1 Cir., 1960, 278 F.2d 184.
 
 
 158
 The petitions of Piasecki and the Union are accordingly denied.
 
 
 159
 The Board's order will be enforced in its entirety.
 
 
 160
 A decree in accordance with this opinion and the N. L. R. B. v. United States Steel Corp. (American Bridge Division), 3 Cir. May 17, 1960, 278 F.2d 896, may be submitted.
 
 
 
 Notes:
 
 
 [1]
 All statutory references herein are to the National Labor Relations Act
 
 
 [2]
 Evidence was offered that an identical letter was addressed to Laurence Loroni, President of Local 840. He denied its receipt, but see the reference to its receipt signed by Botheand Loroni in their letter of November 5.
 
 
 [3]
 "13. At least fifteen days prior to settlement under this contract, Bellanca shall notify all employees of the termination of their employment and in all other respects comply with the provisions of the contract between Bellanca and Local 840 UAW, CIO in order to effectively terminate said contract and employment of all persons covered by said contract prior to settlement. Bellanca warrants that all wages and accrued vacations are or will be paid or provided for as of the date of termination."
 
 
 [4]
 N.L.R.B. v. Colten, 6 Cir., 105 F.2d 179; N.L.R.B. v. Fred P. Weissman Co., 6 Cir., 170 F.2d 952, certiorari denied 336 U.S. 972, 69 S.Ct. 942, 93 L.Ed. 1122; Dickey v. N.L.R.B., 6 Cir., 217 F.2d 652; N.L.R.B. v. Lunder Shoe Corp., 7 Cir., 211 F.2d 284; N.L.R.B. v. Armato, 7 Cir., 199 F.2d 800
 
 
 [5]
 "(d) for the purposes of this section to bargain collectively is the performance of mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or for the negotiations of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession:Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification —
 "(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;"
 
 
 [6]
 "* * * He [the General Counsel] shall have final authority on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law."
 
 
 [7]
 "(c) The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice,and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: * * *" (Emphasis supplied.)
 
 
 
 161
 HASTIE, Circuit Judge (dissenting in part).
 
 
 162
 I agree with the majority that the conclusion of the Board that Piasecki, the employer, was not guilty of a violation of Section 8(a) (5) in refusing to bargain with the union should be sustained. The facts that the employer's predecessor had terminated the employment of its personnel and, pursuant to express authorization in its contract with the union, had terminated the union's bargaining rights, all before Piasecki took over the plant, distinguish this case from those which have applied the "successor" corporation doctrine. Cf. N. L. R. B. v. Colten, 6 Cir., 1939, 105 F.2d 179. I would not extend the Colten rule to cover this situation.
 
 
 163
 However, I disagree with the court's disposition of the matter of refusal to hire because of union affiliation in violation of Section 8(a) (3). Any such violation which may have occurred on November 25th and November 26th was, in my view, cured on November 30th when the employer extended to each of the recent employees of its predecessor an unequivocal invitation to apply and report to its Philadelphia office for "consideration for immediate employment at New Castle".
 
 
 164
 The complaining employees ignored this invitation. I can find nothing in the record to justify a conclusion that the employer's offer was not genuine or even that it was ignored in that belief. What the employer was insisting, as an officer of the union testified and the trial examiner found, was that hiring be accomplished by direct dealings between the employer and the several applicants rather than through the union as a bargaining agent. The union and its adherents were strenuously resisting this denial of representative status. But this court's disposition of the charge under Section 8(a) (5) establishes that the union was not entitled to be recognized as bargaining agent at that time. In these circumstances no right to reinstatement and back pay survived the employees' rejection of the offer of November 30th.
 
 
 165
 To that extent I dissent from the decision to enforce the order of the Board.